# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00167-CMA-STV

LAQUITA JONES, *et al.*, individually and as representatives of a class of similarly situated persons, on behalf of the DISH NETWORK CORPORATION 401(K) PLAN,

    Plaintiffs,

    v.

DISH NETWORK CORPORATION, *et al.*,

    Defendants

**BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

1

## INTEREST OF THE *AMICUS CURIAE*

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.[1]  Given the importance of the laws governing fiduciary conduct to its members, many of which maintain or provide services to retirement plans, the Chamber regularly participates as *amicus curiae* in ERISA cases at all levels of the federal-court system, including those addressing the pleading standard for fiduciary-breach claims. The Chamber submits this brief to provide context on retirement-plan management and how this case is situated in the broader litigation landscape.

## INTRODUCTION

This case is one of many in a recent surge of putative class actions challenging the management of employer-sponsored retirement plans.  This explosion in litigation is not "a warning that retirees' savings are in jeopardy."  Daniel Aronowitz, *Exposing Excessive Fee Litigation Against America's Defined Contribution Plans* 3, Euclid Specialty (Dec. 2020), https://bit.ly/3hNXJaW ("*Excessive Fee Litigation*").  To the contrary, "in nearly every case, the asset size of many of these plans being sued has increased—often by billions of dollars"—over the last decade.  *Id.*  Nevertheless, many of these suits cherry-pick particular data points, disregard universally understood principles of plan

---

[1] No counsel for a party authored this brief in whole or in part.  No party, no counsel for a party, and no person other than *Amicus*, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

2

management, and ignore documents that are judicially noticeable or integral to the plaintiffs' claims—including fee disclosures provided directly to participants, 29 C.F.R. § 2550.404a-5—demonstrating the flawed nature of many plaintiffs' allegations in an effort to create an illusion of mismanagement and imprudence.

The complaints typically follow a familiar playbook, often loaded with legal conclusions but few factual allegations specific to the particular plan at issue. Using the benefit of hindsight, these lawsuits challenge the decisions plan fiduciaries made about the investment options available to retirement plan participants or the arrangements fiduciaries negotiated with the plan's service provider. The complaints generally point to alternative investment or service options (among tens of thousands of investment options offered in the investment marketplace and the dozens of service providers with a wide variety of service offerings and price points) and allege that plan fiduciaries *must have* had a flawed decisionmaking process because they did not choose one of those alternatives. They then lean heavily on ERISA's perceived complexity to open the door to discovery, even where their conclusory allegations are belied by publicly available data.

No plan, regardless of size or type, is immune from this type of challenge. It is always possible for plaintiffs to use the benefit of hindsight to identify, among the almost innumerable options available in the marketplace, a better-performing or less-expensive investment option or service provider than the ones plan fiduciaries chose. That is not sufficient under the pleading standard established in *Hughes v. Northwestern University*, 142 S. Ct. 737, 740 (2022), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

3

If these types of conclusory and speculative complaints are sustained, plan participants will be the ones who suffer. The suits pressure fiduciaries to limit investments to a narrow range of options at the expense of providing a diversity of choices with a range of fees, fee structures, risk levels, and potential performance upsides, as ERISA expressly encourages and as most participants want. These lawsuits also operate on a cost-above-all mantra—despite the Department of Labor's ("DOL") admonition that fees should be only "one of several factors" in fiduciary decisionmaking.[2] And given many plaintiffs' single-minded emphasis on cost, these lawsuits pressure fiduciaries to forgo packages that include popular and much-needed services.

If the recent flood of litigation has taught us anything, it is that it is virtually impossible for fiduciaries to prevent themselves from becoming the subject of a lawsuit— no matter how rigorous their process, no matter the high quality of the funds that they choose, and no matter how low the fees they negotiate. This lawsuit is a perfect example: Plaintiffs allege that Defendants breached the duty of prudence by offering actively managed Freedom Funds rather than passively managed Fidelity Freedom Fund Index Target Date Funds. Compl. ¶¶ 61-63. As an initial matter, there is nothing improper about DISH's decision to offer an actively managed fund—especially as part of a menu of a diverse set of actively and passively managed funds. Nor does ERISA require plan sponsors to select only the cheapest or highest performing funds. *See* p. 11, *infra*. But even accepting Plaintiffs' premise, Plaintiffs themselves acknowledge that "the Active suite has enjoyed some positive recent returns," and that "the managers of the Active

---

[2] DOL, *A Look at 401(k) Plan Fees* 1 (Sept. 2019), https://bit.ly/3fP8vuH ("*401(k) Fees*").

suite made certain tactical shifts in the funds' asset allocation in or about 2020 that yielded positive returns in the high-volatility environment in 2020 and 2021." Compl. ¶ 63 n.10. Plaintiffs vaguely argue that this positive performance "does not exonerate Defendants," *id.*, but the flexibility to respond to market conditions is the precise benefit of active management. And yet, despite "produc[ing] more positive returns," *id.*, Defendants still found themselves the subject of suit. Plan sponsors and fiduciaries today truly are, as the Supreme Court has observed, "between a rock and a hard place." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424 (2014).

Against this backdrop, courts must not shy away from the "context-specific inquiry" ERISA requires. *Hughes*, 142 S. Ct. at 740; *see also Fifth Third*, 573 U.S. at 425. As the Supreme Court recently made explicit, ERISA cases are subject to the pleading standard articulated in *Twombly* and *Iqbal*. *See Hughes*, 142 S. Ct. at 742. When a plaintiff does not present direct allegations of wrongdoing and relies on circumstantial allegations that are "just as much in line with" plan fiduciaries' having acted through a prudent fiduciary process, dismissal is required. *See Twombly*, 550 U.S. at 554.

## ARGUMENT

### I. There is no ERISA exception to Rule 8(a)'s pleading standard.

The last 15 years have seen a surge of ERISA litigation.[3] What began as a steady increase has exploded in the past two years, culminating in over 100 excessive-fee suits

---

[3] *See, e.g.*, George S. Mellman & Geoffrey T. Sanzenbacher, *401(k) Lawsuits: What are the Causes and Consequences?*, Ctr. for Retirement Research at Boston College (May 2018), https://bit.ly/3fUxDR1 (documenting rise in 401(k) complaints from 2010 to 2017).

5

in 2020—a five-fold increase over 2019.[4]  The last 16 months have seen more of the same, including many cases filed against hospitals whose resources have been taxed during the pandemic.  These cases generally do not develop organically based on plan-specific details, but rather are advanced as prepackaged, one-size-fits-all challenges.  As a result, plaintiffs typically rely on generalized allegations that do not reflect the context of a particular plan—closing their eyes to the fee information they are provided pursuant to ERISA's mandatory disclosure requirements.  *See* 29 C.F.R. § 2550.404a-5.

The Supreme Court has taken several recent opportunities to address the standard for pleading a viable ERISA claim.  Each time, it has stressed that ERISA plaintiffs, like all civil plaintiffs, must satisfy the Rule 8 pleading standard articulated in *Twombly* and *Iqbal*.  *Hughes*, 142 S. Ct. at 742.[5]  Given the variety among ERISA plans, the wide discretion fiduciaries have when making decisions on behalf of tens of thousands of employees with different investment styles and risk tolerances, and the risk that any ERISA suit can be made to appear superficially complicated, applying Rule 8(a) requires a close evaluation of "the circumstances … prevailing at the time the fiduciary acts" and a "careful, context-sensitive scrutiny of a complaint's allegations."  *Fifth Third*, 573 U.S. at 425.  "[C]ategorical rules" have no place in this analysis—particularly because, as the Court has recognized, "the circumstances facing an ERISA fiduciary will implicate difficult

---

[4] *See Understanding the Rapid Rise in Excessive Fee Claims* 2, AIG, https://bit.ly/3k43kt8 (last visited Apr. 2, 2022); *see also* Jacklyn Wille, *401(k) Fee Suits Flood Courts, Set for Fivefold Jump in 2020*, Bloomberg Law (Aug. 31, 2020), https://bit.ly/3fDgjQ5.
[5] The Court thus rejected some circuits' suggestion that a lower pleading standard applies in ERISA cases.  *See Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 108 & n.47 (2d Cir. 2021); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 326 (3d Cir. 2019).

tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742. If anything, this discretion and flexibility should make pleading through hindsight-based circumstantial allegations *more* difficult, not less.

The allegations in many of the cases in this wave of litigation fail this standard twice over. First, the circumstantial allegations are often equally (if not far more) consistent with lawful behavior, and therefore cannot "nudge[] the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Second, the allegations frequently ignore the discretion fiduciaries have to make decisions based on their experience and the needs of their particular participants.

### A. These lawsuits often manufacture factual disputes that do not survive minimal scrutiny.

The shared problem with many of these lawsuits is exemplified by a feature in the majority of the complaints. Plaintiffs typically create a chart (or many charts) purporting to compare some of the investment options in the plan under attack to other options available on the market that allegedly out-performed or had lower fees than the plan's options during a cherry-picked time period. *See, e.g.*, Compl. ¶¶ 70, 76, 80. They then use the charts to barrel past dismissal, asking the Court to infer that plan fiduciaries must have been asleep at the wheel and requesting discovery to prove it. Inferring imprudence from this tactic ignores the realities of plan management and ERISA's statutory structure—important "context" the Supreme Court has instructed lower courts to consider. But plaintiffs' attorneys can easily cherry-pick historical data to make a fiduciary's choices look suboptimal given the near-infinite combination of comparator options and time

7

periods. Take the federal Thrift Savings Plan ("TSP"), which is regularly used by plaintiffs as a comparator to argue that an investment underperformed or had excessive fees.[6] Even the TSP could be made to look like a mismanaged plan by cherry-picking comparators with fees that are significantly lower than the TSP's[7]:

| Fund | Expense Ratio |
|---|---|
| *TSP Fixed Income Index Investment Fund (F Fund)* https://www.tsp.gov/funds-individual/f-fund/?tab=fees | 0.058% |
| iShares Core US Aggregate Bond ETF https://www.morningstar.com/etfs/arcx/agg/price | 0.040% |
| Vanguard Total Bond Market Index Fund (Institutional Plus Shares) https://www.morningstar.com/funds/xnas/vbmpx/price | 0.030% |
| | |
| *TSP Common Stock Index Investment Fund (C Fund)* https://www.tsp.gov/funds-individual/c-fund/?tab=fees | 0.043% |
| Fidelity 500 Index Fund https://www.morningstar.com/funds/xnas/fxaix/price | 0.015% |
| iShares S&P 500 Index Fund (Class K) https://www.morningstar.com/funds/xnas/wfspx/price | 0.030% |
| | |
| *TSP Small Cap Stock Index Investment Fund (S Fund)* https://www.tsp.gov/funds-individual/s-fund/?tab=fees | 0.059% |
| Fidelity Extended Market Index Fund https://www.morningstar.com/funds/xnas/fsmax/price | 0.040% |

As this example shows, when plaintiffs' attorneys zero in on a single metric for comparison—in the above example, fees—they will *always* be able to find a supposedly

---

[6] *See, e.g., Brotherston v. Putnam Invs., LLC*, Appellants' Br., No. 17-1711, 2017 WL 5127942, at *23 (1st Cir. Nov. 1, 2017) (describing TSP as "a quintessential example of a prudently-designed plan"); *see also* Thrift Savings Plan, Tex. State Sec. Bd., https://bit.ly/3wE4MXA (last visited Apr. 1, 2022) ("The TSP is considered the gold standard of 401(k)s because it charges extremely low fees and offers mutual funds that invest in a cross-section of the stock and bond markets."). The TSP is a particularly inapt exemplar given that the U.S. government subsidizes administrative and investment-management expenses, thereby inflating the plan's net-of-fees investment performance.
[7] This data is based on the most recently available figures as of March 1, 2022.

8

"better" fund among the thousands on the market. The same is true of charts purporting to identify a "superior" alternative measured by recent investment returns. With the benefit of hindsight, one can always identify a better-performing fund during a cherry-picked time period, but chasing performance—*i.e.*, switching investment strategies to pursue the fund performing well at the time—is a misguided investment approach "generally doomed to some kind of failure."[8]

Moreover, plaintiffs frequently compare apples and oranges: comparing the performance of Fund A with one investment style and performance benchmark with that of Fund B, which has a demonstrably different investment style and performance benchmark. *See, e.g.*, *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1108 (D. Colo. 2020) (rejecting plaintiffs' reliance on "inapt comparators"). These barebones comparisons are particularly unhelpful with respect to recordkeeping fees. As DOL has explained, services "may be provided through a variety of arrangements,"[9] and neither recordkeepers nor recordkeeping services are interchangeable widgets. Instead, recordkeeping services are highly customizable depending on, *e.g.*, the needs of each plan, its participant population, the capabilities and resources of the plan's administrator, and the sponsor's human-resources department. *See Excessive Fee Litigation* 3. Myriad services are available at different fee levels, among them core operational services, participant communication, participant education, brokerage windows, loan processing,

---

[8] Kate Stalter, *Chasing Performance Is a Quick Way to Disaster*, U.S. News (Feb. 8, 2017), https://bit.ly/3IhKn0R.
[9] *401(k) Fees* 3.

and compliance services.[10]  While ERISA plaintiffs often ask courts to ignore these practical realities on a motion to dismiss, the Supreme Court has said the opposite—that "context" *must* be considered at the 12(b)(6) stage.  *Fifth Third*, 573 U.S. at 425.

### B. Fiduciaries have discretion to make a range of reasonable choices.

The allegations in these complaints often fail to grasp a fundamental tenet of ERISA—the "range of reasonable judgements a fiduciary may make" and the "difficult tradeoffs" inherent in fiduciary decisionmaking.  *Hughes*, 142 S. Ct. at 742.  As relevant here, ERISA in no way prohibits an employer from using active management.  Rather, Congress designed a statute that affords plan sponsors and fiduciaries extensive flexibility, which it viewed as "essential to achieve the basic objectives of private pension plans because of the variety of factors which structure and mold the plans to individual and collective needs of different workers, industries, and locations."  S. Rep. No. 92-634, at 16 (1972).  Neither Congress nor the DOL provides a list of required or forbidden investment options or strategies, and when Congress considered requiring plans to offer at least one index fund, the proposal failed.  *See* H.R. 3185, 110th Cong. (2007).

This flexibility means that fiduciaries have a wide range of reasonable options for almost any decision they make.  There are thousands of reasonable investment options with different investment styles and risk levels, and nearly innumerable ways to put together a plan that enables employees to save for retirement.  That fiduciaries did not select what turned out to be the lowest-cost or best-performing option does not suggest

---

[10] *See, e.g.*, Sarah Holden et al., *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, at 4, ICI Research Perspective (June 2021), https://bit.ly/3vnbCU3.

that cherry-picked comparators were in fact "better" overall. "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker v. Deer & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). There will always be plans with lower expenses and plans with higher ones, just as there will always be a fund that performs better and many funds that perform worse. There is no one prudent fund, service provider, or fee level that renders everything else imprudent. Instead, there is a wide range of reasonable options, and Congress vested fiduciaries with flexibility and discretion to choose from among those options based on their informed assessment of the needs of their plan and its unique participant base.

The complaints themselves reflect a range of assessments: one complaint's supposedly imprudent choice is often another's prudent exemplar. As noted, Plaintiffs here allege imprudence based on Defendants' decision to make available actively managed funds, alongside passive index funds. *See* Compl. ¶¶ 61-63. But plaintiffs in other cases have alleged a breach of fiduciary duty based on a plan's decision to include passively managed funds rather than actively managed ones—the exact opposite of the allegations here. *See* Compl. ¶¶ 79-83, *Ravarino v. Voya Fin., Inc.*, No. 21-1658 (D. Conn. Dec. 14, 2021), ECF No. 1. This same phenomenon plays out with respect to plan performance. General Electric was sued in 2017 for including the GE RSP U.S. Equity Fund, among others, in its 401(k) plan. *See* Compl. ¶ 1, *Haskins v. Gen. Elec. Co.*, No. 3:17-cv-01960-CAB-BLM (S.D. Cal. Sept. 26, 2017), ECF No. 1. But a different case held up *that exact fund* as a "superior performing alternative[]." Compl. ¶ 122, *Harding v. Southcoast Hosps. Grp.*, No. 1:20-cv-12216-LTS (D. Mass. Dec. 14, 2020), ECF No. 1.

As these complaints demonstrate, ERISA fiduciaries making discretionary decisions are at risk of being sued seemingly no matter what decisions they make. Plaintiffs sue fiduciaries for failing to divest from risky or dropping stock,[11] or for failing to *hold onto* such stock because high risk can produce high reward.[12] Some plaintiffs allege that it is imprudent for a plan to offer more than one investment option in the same style,[13] while others complain that including *only one option* in each investment style is imprudent.[14] In many cases, plaintiffs allege that fiduciaries were imprudent because they should have offered Vanguard mutual funds,[15] but others complain that defendants were imprudent *because they offered* Vanguard mutual funds.[16] Some plaintiffs allege that plans offered imprudently risky investments,[17] while others allege that fiduciaries were *imprudently cautious* in their investment approach.[18] And in some instances, fiduciaries have simultaneously defended against "diametrically opposed" theories of

---

[11] *E.g.*, *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 611 (N.D. Tex. 2008).
[12] *E.g.*, *Thompson v. Avondale Indus., Inc.*, 2000 WL 310382, at *1 (E.D. La. Mar. 24, 2000) (plaintiff alleged that fiduciaries "prematurely" divested ESOP stock).
[13] *E.g.*, *Sweda v. Univ. of Penn.*, 2017 WL 4179752, at *10 (E.D. Pa. Sept. 21, 2017), *rev'd in part*, 923 F.3d 320 (3d Cir. 2019).
[14] *E.g.*, Am. Compl. ¶ 52, *In re GE ERISA Litig.*, No. 17-cv-12123-IT (D. Mass. Jan. 12, 2018), ECF No. 35.
[15] *E.g.*, *Moreno v. Deutsche Bank Ams. Holding Corp.*, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016).
[16] *E.g.*, Am. Compl. ¶ 108, *White v. Chevron Corp.*, No. 16-cv-0793-PJH (N.D. Cal. Sept. 30, 2016), ECF No. 41.
[17] *E.g.*, *In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 608 (S.D.N.Y. 2015), *aff'd sub nom.*, *Muehlgay v. Citigroup Inc.*, 649 F. App'x 110 (2d Cir. 2016); *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 711 (2d Cir. 2013).
[18] *See Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859-860 (8th Cir. 1999) (claim that fiduciaries maintained an overly safe portfolio); Compl. ¶2, *Barchock v. CVS Health Corp.*, No. 16-cv-61-ML-PAS, (D.R.I. Feb. 11, 2016), ECF No. 1 (claim that fiduciaries imprudently invested in overly conservative funds).

liability, giving new meaning to the phrase "cursed-if-you-do, cursed-if-you-don't."[19] This dynamic has made it incredibly difficult for fiduciaries to do their job—and it has made it nearly *impossible* for fiduciaries to avoid being sued, no matter how careful their process and no matter how reasonable their decisions.

Accordingly, it is critical for courts to consider context—things like the DOL's instruction that fees are only one of *several factors* that should be considered,[20] publicly available information demonstrating that a complaint's supposed comparators are inapposite, industry data showing that services (and their pricing) vary widely, and the performance ebbs and flows that are common characteristics of investment management all bear on whether fiduciary-breach claims are plausible. Nevertheless, some courts have declined to consider context when evaluating whether a plaintiff's claims are plausible, suggesting that it merely creates a dispute of fact. That approach cannot be squared with the Supreme Court's direction to "give due regard to the range of reasonable judgments a fiduciary may make," recognizing that a bare allegation that one fiduciary made a decision different from another fiduciary is insufficient to survive a motion to dismiss. *Hughes*, 142 S. Ct. at 742.

## II. These lawsuits will harm participants and beneficiaries.

### A. These lawsuits pressure plan sponsors to manage plans based solely on cost.

The pressure created by these suits undermines one of the most important aspects of ERISA: the value of innovation, diversification, and employee choice. Plaintiffs often

---

[19] *E.g.*, *Evans v. Akers*, 534 F.3d 65, 68 (1st Cir. 2008).
[20] *401(k) Fees* 1.

13

take a cost-above-all approach, filing strike suits against any fiduciaries that consider factors other than cost—notwithstanding ERISA's direction to do precisely that. *See White v. Chevron Corp.*, 2016 WL 4502808, at *10 (N.D. Cal. Aug. 29, 2016). An investment committee may, for example, feel pressured by the threat of litigation to offer only "a diversified suite of passive investments," despite "actually think[ing] that a mix of active and passive investments is best." *See* David McCann, *Passive Aggression*, CFO (June 22, 2016), https://bit.ly/2Sl55Yq. Likewise, these suits affect the recordkeeping services fiduciaries select, pushing plan sponsors toward the lowest-cost option, even though DOL has acknowledged "that cheaper is not necessarily better." *See 401(k) Fees* 1. The collective impact of these lawsuits is to pressure plan fiduciaries to chase investment performance or the lowest-cost fees or services, whether or not doing so is in participants' interest. In a purported effort to safeguard retirement funds, plaintiffs actually pressure fiduciaries *away from* exercising their "responsibility to weigh … competing interests and to decide on a (prudent) financial strategy." *Brown v. Daikin Am., Inc.*, 2021 WL 1758898, at *7 (S.D.N.Y. May 4, 2021).

### B.  Changes in the liability-insurance market will harm participants.

The litigation surge has upended the insurance industry for retirement plans. Judy Greenwald, *Litigation Leads to Hardening Fiduciary Liability Market*, Business Insurance (Apr. 30, 2021), https://bit.ly/3ytoRBX. The risks of litigation have pushed fiduciary insurers "to raise insurance premiums, increase policyholder deductibles, and restrict exposure with reduced insurance limits." *Excessive Fee Litigation* 4; *see also* Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg Law

(Oct. 18, 2021), https://bit.ly/307mOHg; Robert Steyer, *Sponsors Rocked by Fiduciary Insurance Hikes*, Pensions & Invs. (Sept. 20, 2021), https://bit.ly/39W996Y. Plans are now at risk of not being able to "find[] adequate and affordable fiduciary coverage because of the excessive fee litigation." *Excessive Fee Litigation* 4; *see also* Jon Chambers, *ERISA Litigation in Defined Contribution Plans* 1, SageView Advisory Grp. (Mar. 2021), https://bit.ly/2SHZuME (fiduciary insurers may "increasingly move to reduce coverage limits, materially increase retention, or perhaps even cancel coverage").

If employers need to absorb the cost of higher insurance premiums and higher deductibles, many employers will inevitably have to offer less generous plans—reducing their employer contributions, declining to cover administrative fees and costs when they otherwise would elect to do so, and reducing the services available to employees. And while large employers may have some capacity to absorb some of these costs, many smaller employers do not. If smaller plan sponsors "cannot purchase adequate fiduciary liability insurance to protect their plan fiduciaries, the next step is to stop offering retirement plans to their employees." *Excessive Fee Litigation* 4. This outcome is wholly at odds with a primary purpose of ERISA—to *encourage* employers to voluntarily offer retirement plans. *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010).

## CONCLUSION

Adopting anything less than the "context-specific inquiry" of ERISA complaints prescribed by the Supreme Court in *Hughes* and *Fifth Third* would create precisely the types of negative consequences that Congress intended to avoid in crafting ERISA. *Amicus* urges the Court to adopt and apply that level of scrutiny to this case.

| | |
|---|---|
| Dated: April 25, 2022 | Respectfully submitted, |
| | /s/ *Jaime A. Santos* |
| Paul Lettow (Of Counsel) | Jaime A. Santos |
| Janet Galeria (Of Counsel) | GOODWIN PROCTER LLP |
| U.S. CHAMBER LITIGATION CENTER | 1900 N Street, NW |
| 1615 H Street, NW | Washington, DC 20036 |
| Washington, DC 20062 | (202) 346-4000 |
| | |
| | Jordan Bock (Of Counsel) |
| | GOODWIN PROCTER LLP |
| | 100 Northern Avenue |
| | Boston, MA 02210 |
| | (617) 570-1000 |
| | |
| | *Counsel for Amicus Curiae the Chamber of Commerce of the United States of America* |

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the District of Colorado by using the court's CM/ECF system on April 25, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

Dated: April 25, 2022

*/s/ Jaime A. Santos*
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*