## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

LAQUITA JONES, LATEESHA
PROCTOR, PATRICK SMITH, and BEN
MCCOLLUM Individually and as
representatives of a class of similarly
situated persons, on behalf of the DISH
NETWORK CORPORATION 401(K)
PLAN,

               Plaintiffs,

      v.

DISH NETWORK CORPORATION, THE
BOARD OF DIRECTORS OF DISH
NETWORK CORPORATION, THE DISH
NETWORK CORPORATION 401(K) PLAN
COMMITTEE; and DOES No. 1-20, Whose
Names Are Currently Unknown,

           Defendants.

Case No: 1:22-cv-00167

**AMENDED CLASS ACTION
COMPLAINT**

## I.      INTRODUCTION

1.     Plaintiffs, LaQuita Jones ("Jones"), Lateesha Proctor ("Proctor"), Patrick Smith

("Smith"), and Ben McCollum ("McCollum" and collectively, "Plaintiffs"), individually and on

behalf of the DISH Network Corporation 401(k) Plan ("Plan") and a proposed class of

participants and beneficiaries in the Plan, bring this action ("Action")[1] under 29 U.S.C. § 1132

against Defendants, DISH Network Corporation ("DISH"), the Board of Directors of DISH

Network Corporation ("Board"), the DISH Network Corporation 401(k) Plan Committee

("Administrative Committee" or "Committee"), and Does No. 1-20, who are members of the

---

[1]This Amended Complaint is submitted pursuant to the Court's Order Affirming and Adopting
Recommendation of United States Magistrate Judge on March 27, 2023 (ECF No. 79) and
pursuant to Federal Rule of Civil Procedure 15(a)(2).

Administrative Committee or the Board or other fiduciaries of the Plan and whose names are currently unknown (collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and related violations of applicable law beginning six years from the date the initial complaint commencing this action was filed and continuing to the date of judgment, or such other date the Court determines is appropriate and just ("Class Period").

2.      Defined contribution plans (*e.g.*, 401(k) and 403(b) plans) that are qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, the participants in defined contribution plans bear the risk of high fees and investment underperformance.

3.      The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans are increasingly rare as an offered and meaningful employee benefit.

4.      As of December 31, 2020, the Plan had 18,808 participants with account balances and assets totaling approximately $841 million, placing it in the top 0.2% of all 401(k) plans by plan size.[2]  Defined contribution plans with substantial assets and participant counts, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and

---

[2]The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 (pub. July 2021).

the investment of 401(k) assets.  The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.      Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, owe a series of duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable in relation to the services obtained.

6.      Defendants breached their fiduciary duties to the Plan.  As detailed below, Defendants failed to appropriately monitor and consequently retained unsuitable investments in the Plan, instead of offering readily-available suitable alternative investments at each period Defendants retained the funds at issue and throughout the Class Period.

7.      To remedy Defendants' breaches of fiduciary duty and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

a.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b.     A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.     Equitable, legal or remedial relief for all losses and/or compensatory damages;

d.     Attorneys' fees, costs and other recoverable expenses of litigation; and

e.     Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.     THE PARTIES

9.     Jones is a former employee of DISH and former participant in the Plan under 29 U.S.C. § 1002(7).  Jones is a resident of Columbus, Ohio.  During the Class Period, Jones maintained an investment through the Plan in the Fidelity Freedom 2040 Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

10.     Proctor is a former employee of DISH and former participant in the Plan under 29 U.S.C. § 1002(7).  Proctor is a resident of Hampton, Georgia. During the Class Period, Proctor maintained an investment through the Plan in the Fidelity Freedom 2050 Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

11.     Smith is a former employee of DISH and former participant in the Plan under 29 U.S.C. § 1002(7).  Smith is a resident of Mountain Top, Pennsylvania.  During the Class Period, Smith maintained an investment through the Plan in the Fidelity Freedom 2040 Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

12.     McCollum is a former employee of DISH and former participant in the Plan under 29 U.S.C. § 1002(7).  McCollum is a resident of Spartanburg, North Carolina.  During the Class

Period, McCollum maintained an investment through the Plan in the Fidelity Freedom 2030 Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

13.     DISH is a public Nevada corporation headquartered in Englewood, Colorado. DISH, through its subsidiaries, offers television, through the DISH and Sling TV brands, and wireless services, through the Boost Mobile and Ting Mobile brands.

14.     The Board appointed "authorized representatives" of DISH, including the Administrative Committee, as plan fiduciaries.  Does No. 1-10 are members of the Board who were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Administrative Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

15.     The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at DISH's corporate headquarters in Englewood, Colorado.  The Administrative Committee and its members are appointed by DISH or its delegate to administer the Plan on DISH's behalf.

16.     Does No. 11-20 are the members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries to the Plan.  Plaintiffs are currently unable to determine the membership of the Administrative Committee or the identity of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Administrative Committee and the identity of any other fiduciaries is not publicly available.  As such, these Defendants are named Does as placeholders.  Plaintiffs will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to

name the members of the Administrative Committee, the members of the Board, and other responsible individuals as defendants as soon as their identities are discovered.

### III.    JURISDICTION AND VENUE

17.    Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

19.     Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because DISH's principal place of business is in this District and the Plan is administered from this judicial district.  Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

20.    Plaintiffs have standing to bring the Action because they maintained investments in the Plan in the investment options challenged in the Action during the Class Period.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by the Court.  In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## IV.   FACTUAL ALLEGATIONS

### A.   Background and Plan Structure

21.    The Plan is a participant-directed 401(k) plan, meaning participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with their participant contributions, applicable employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various mutual funds, DISH common stock, and EchoStar Corporation ("EchoStar") common stock.

22.    Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

23.    The Plan holds shares of DISH Class A common stock and EchoStar Class A common stock.  Participants are not permitted to invest their contributions in either stock.  DISH may make discretionary profit-sharing contributions of DISH common stock.  In separate transactions in 2017 and 2019, DISH acquired certain employees of EchoStar,[3] whose assets, including those invested in EchoStar common stock, were transferred into the Plan.

---

[3]Prior to certain of its employees being acquired by DISH, EchoStar was already part of an

24.     During the Class Period, Plan assets were held in a trust by the Plan Trustee, Fidelity Management Trust Company.  All investments and asset allocations are performed through this trust instrument.

**B.     Defendants' Breaches of Fiduciary Duties**

25.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan in several significant ways.  Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before the complaint initiating this Action was filed.

### 1.     The Committee's Monitoring Process

26.     For the entirety of the relevant period, Defendants maintained an Investment Policy Statement ("IPS") to guide the Plan fiduciaries in their monitoring and evaluation of the Plan's investment lineup.   The consistent application of the guidelines in an IPS is a vital component of an investment selection and monitoring process and, when employed properly, ensures that investment funds are assessed in a replicable manner and in a manner that meets the applicable standard of care for similarly situated fiduciaries.  The IPS articulates the relevant criteria for the Committee's fund selection, monitoring, and removal processes.  Under the IPS, the Committee is to monitor the performance of Plan investments on a recurring basis over trailing one-, three- and five-year periods.  While some courts have suggested that three- and five-year intervals are too short to appropriately assess fund performance, the IPS guiding the

Internal Revenue Code Section 414 brother-sister controlled group of corporations with DISH, so all acquired EchoStar employees were given prior service credit under the Plan for eligibility and vesting purposes for the time they were employed by EchoStar.

actions of the fiduciaries for *this specific Plan* requires greater weight be placed on an investment's three- and five-year returns[4] because such returns are more meaningful.[5]

27.     The IPS dictates that the Committee evaluate each investment's returns and risk-adjusted returns against those of the appropriate peer group over such long-term periods.  Should a fund fail to beat the peer median return over three or five years, or fail to exceed the peer median risk-adjusted return over three years, the Committee may place the fund on a watchlist. Greater scrutiny must be applied to a fund that is consistently underperforming according to these standards, ultimately resulting in a considered decision as to whether to replace the fund.

28.     Importantly, the IPS sets no threshold for a meaningful level of underperformance.  Rather, it recognizes that *consistent* underperformance according to the enumerated criteria is the hallmark of a potentially undesirable investment.

---

[4]Indeed, the IPS specifically categorizes three- and five-year periods as a proxy for a longer-term market cycle.

[5]This is consistent with the guidance of virtually all competent investment advisors that fiduciaries should focus on three- and five-year returns to evaluate the performance of an investment over periods most closely approximating a market cycle. Any suggestion that a TDF has a lifespan of 10 or 25 years and, therefore, performance metrics of three to five years should not be considered is nonsensical because (a) at any point in time, many vintages of TDFs have shorter lifespans than 10, and especially 25, years, and (b) most importantly, in light of employment mobility in the United States (with the average employee holding a position for slightly more than four years), competent and informed fiduciaries understand that many (and likely most) participants will not maintain their TDF investments within a defined contribution plan such as the Plan until the actual target date of the given investment.  Thus, three- and five-year performance is paramount in the minds of any competent fiduciary of a retirement plan and poor performance over those periods demands investigation and action by fiduciaries. Occasional outlier court suggestions to the contrary frankly and simply betray a lack of fundamental knowledge and understanding as to the specific methods by which responsible fiduciaries approach their duties in the context of defined contribution plans in the United States.

29.     Significant turnover or change in an investment's assets under management is another enumerated criterion that the IPS identifies that the Committee should consider when weighing whether to add a fund to the watchlist.

30.     The Committee met several times during the Class Period (but not quarterly—as is the practice of nearly all fiduciaries of retirement plans as large as the Plan), ostensibly to engage in the monitoring process prescribed by the IPS.  As discussed in further detail below, it is apparent from the minutes of each meeting,[6] which amount to little more than brief, handwritten, shorthand bullet points, that no such careful evaluation occurred.

**2.     The Plan's Investment in the Fidelity Freedom Funds**

31.     Among other investments, the Plan lineup offers a suite of fourteen target date funds ("TDF(s)").[7]  A TDF is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  TDFs offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation.  All TDFs are inherently

---

[6]The Committee's meeting minutes do not identify any attendees or participants by name, including any Committee members or members of the Board who retain responsibility for appointing Committee members.

[7]The Freedom Fund suite offers a different fund for target dates every five years and an Income fund (for years once the retirement target year is reached). From prior to the start of the Class Period through October 2019, Defendants opted not to offer the full suite (*i.e.*, 2020, 2025, 2030) and instead offered only those vintages with a target date at the beginning of each decade (*i.e.*, 2020, 2030, 2040) and the Income fund.  Virtually every large defined contribution plan with a TDF offering offers the full complement of vintages in order to significantly reduce the range of risk-seeking allocations to be closer to the age-appropriate asset allocation. Indeed, for a significant portion of the Class Period, consistent with Defendants' inattention to the best interest of Plan participants, the Committee failed to provide an appropriate asset allocation solution that fit the investment and retirement needs of half the Plan's participant population.  That failure constituted an independent, actionable breach that caused the Plan and its participants to suffer losses.

actively managed, because managers make changes to the allocations to stocks, bonds and cash over time. These allocation shifts are referred to as a fund's glide path. The underlying mutual funds that TDF managers choose to populate each asset class can be actively or passively managed. This Complaint does not challenge the selection of TDFs that include actively managed investments and does not challenge active management specifically or in general. Nor does it challenge the cost of active management, or indeed the expense ratios charged by the managers of any investment fund. There is nothing inherently wrong with choosing actively managed funds, as long as the expected return of the fund justifies the increased expense and risk, as compared to other readily available investment options. In other words, to justify choosing an actively managed investment, fiduciaries of a retirement plan must, at a minimum, engage in a rational economic decision-making process to justify the more expensive and inherently riskier investment. That maxim is well established in the retirement industry and as a matter of basic investment theory. Since the fiduciaries here employed a fundamentally irrational decision-making process (*i.e.*, inconsistent with their duty of prudence), they breached their fiduciary duties under ERISA, which are the "highest known to law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (citing *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

32.    The Plan has offered a limited selection of the Fidelity Freedom fund target date suite ("Freedom funds") since October 21, 2005. Fidelity Management & Research Company ("Fidelity") is the second largest TDF provider by total assets. Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider, including other mutual fund families that have portfolios composed of actively managed sub-funds, which are readily available in the market

and, unlike the Freedom funds, offer a reasonable expectation of increased returns to justify their increased costs and risk.  Defendants should have considered the merits and features of all available TDF options, but failed to compare the Freedom funds to all other available TDFs (including actively managed TDFs that offer expected returns sufficient to justify the associated costs and risk).

33.      A simple weighing of the benefits of all other available TDFs at the beginning of the Class Period, at which point Defendants' breach of their fiduciary duties occurred, would have raised a significant red flag for prudent fiduciaries.  An objective evaluation of the Freedom funds, consistent with the guidance set forth in Defendants' own IPS, would have resulted in the conclusion that the suite was not a suitable and prudent option for the Plan and the consequent selection of a more suitable, consistent, and better-performing TDF than the Freedom funds.  *See Lauderdale v. NFP Ret., Inc.*, No. 8:21-CV-301-JVS-KES, 2022 WL 17260510, at *10 (C.D. Cal. Nov. 17, 2022) (quoting *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001)) ("Fiduciaries who are responsible for plan investments governed by ERISA 'must comply' with the 'plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA'"); *Baird v. BlackRock Inst. Tr. Co., N.A.*, 2021 WL 105619, at *3 (N.D. Cal. Jan. 12, 2021) (finding genuine disputes of material fact relevant to whether defendants failed to follow the plan's investment policy statement when they failed to obtain an opinion of counsel as required by the policy before including funds at issue in the plan).  Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of Plan participants, they would not have retained the Freedom funds.  But Defendants failed to act in the interests of Plan

participants and breached their fiduciary duties by imprudently retaining and failing to appropriately monitor the Freedom funds.

34.     Exacerbating Defendants' imprudent choice to offer the Freedom funds is the suite's designation as the Plan's Qualified Default Investment Alternative ("QDIA").  Under DOL regulations, retirement plan fiduciaries can select one of the investment offerings in a plan's lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets.  If participants do not indicate where their assets should be invested, their contributions are automatically invested in the QDIA.  Thus, it is vital for fiduciaries to understand the relevant population of plan participants and ensure that the QDIA is a suitable and prudent option for them.  Indeed, Plan fiduciaries are responsible for prudently selecting and continuously monitoring an appropriate QDIA.  The Fidelity Freedom fund with the target year closest to a participant's assumed retirement age (*i.e.*, age 65) serves as the Plan's QDIA.

35.     Because the vast majority of Plan participants are not sophisticated investors, many concentrate their retirement assets in TDFs.  Thus, the impact of Defendants' imprudent selection of TDFs is magnified vis-à-vis other asset categories.  Indeed, by December 31, 2020, approximately 47% of the Plan's assets were invested in the Freedom funds.

> i.   The Freedom Funds are High-Risk and Unsuitable for Plan Participants

36.     Defendants breached their fiduciary duties by failing to replace the Freedom funds by the start of the Class Period.  Since the Freedom fund series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by ten percentage points in either direction.  Departing from the accepted wisdom that TDFs should maintain pre-set allocations, Fidelity encouraged its portfolio managers to

participate in "active asset allocation," an attempt to time market shifts in order to locate underpriced securities.  This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Freedom funds.  In fact, a March 2018 Reuters special report on the Freedom funds (the "Reuters Report") details how many investors lost confidence in the Freedom funds "because of their history of underperformance, frequent strategy changes and rising risk."[8]  The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Freedom funds] knew what they were doing."[9]  The Committee failed to acknowledge or address the Reuters report, or any of the concerns it raised, at its June 1, 2018 meeting (the only recorded 2018 Committee meeting following the release of the Reuters report).

37.    While many TDF managers increase their exposure to riskier investments in an effort to improve returns, the president of research firm Target Date Solutions cautions that the Freedom funds have gone further down this path than peers.[10]  Other industry experts have criticized the "chaotic glide paths" of the Freedom funds relative to peer target date providers.[11]  No consideration, discussion, or deliberation about the significance of any of the myriad industry criticisms of the Freedom funds is reflected in the paltry and superficial minutes of any Committee meeting during the Class Period.  Morningstar noted in the past that active management hindered the suite's performance, criticizing a previous poor decision to heavily

---

[8]Tim McLaughlin & Renee Dudley, *Special Report: Fidelity puts 6 million savers on risky path to retirement*, REUTERS, March 5, 2018, https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.

[9]*Id.*

[10]*Id.*

[11]Idzorek, T., J. Stempien, and N. Voris, 2011, Bait and Switch: Glide Path Instability, Ibbotson Associates.

weight to commodities, and similarly characterized Fidelity's shifts in the stock allocation between 1996–2010 as "shocking" and "seemingly chaotic." Yet since 2014, the Freedom funds—a fund family with a history of poor returns—have had "carte blanche" to take further risks, to the severe detriment of the Plan and its participants. The minutes of the Committee meetings contain no acknowledgement of potential issues with the tactical asset allocation employed by the Freedom funds' managers following the strategy changes.

ii.    The Committee's Failure to Monitor the Performance
       Shortcomings of the Freedom Funds

38.    At the start of the Class Period, Defendants clearly failed to conduct any objective evaluation of the performance of the Freedom funds in accordance with the criteria enumerated in the IPS. Prior to and throughout the Class Period, there were other TDFs that consistently outperformed the Freedom funds pursuant to the very criteria enumerated in the Plan's IPS, providing investors with substantially more capital appreciation. The Freedom funds' inability to consistently produce favorable returns by the Committee's own chosen metrics should have been apparent to Defendants through any consistent assessment of the standards articulated in the IPS. Indeed, by the start of the Class Period in January 2016, the Freedom funds had persistently failed to exceed the median three- and five-year trailing returns of peer TDFs for sixteen consecutive quarters through December 31, 2015.[12] The minutes of Committee meetings at the start of the Class Period (for meetings held on May 26, 2016 and August 31, 2016) contain no

---

[12]Any suggestion that the performance of the Freedom funds marginally improved during the Class Period cannot excuse the breach committed by Defendants at the start of the Class Period when they failed to investigate alternatives and replace the Freedom funds consistent with their duty to monitor the Plan's investments. Doing so would inappropriately exonerate a breach through hindsight analysis. Moreover, marginal improvements in such performance did not erase the tens of millions of dollars lost by the Committee's abject failure to abide by its own IPS.

acknowledgement or discussion of these shortcomings or the consistent, terrible performance of the Freedom funds over the previous  several years.  The below chart provides the average percentile ranking, from 1 (best) to 100 (worst), of the Freedom funds from the start of 2012 through the Committee's first meeting following the start of the Class Period (May 26, 2016), which were available to Defendants in real time at the points in time they made the decisions to retain the Freedom funds.

| Average Peer Ranking of Freedom Fund Returns | | |
|---|---|---|
| As of | Three-Year Ranking | Five-Year Ranking |
| March 31, 2012 | 71 | 52 |
| June 30, 2012 | 78 | 53 |
| September 30, 2012 | 80 | 56 |
| December 31, 2012 | 84 | 72 |
| March 31, 2013 | 84 | 75 |
| June 30, 2013 | 79 | 83 |
| September 30, 2013 | 76 | 83 |
| December 31, 2013 | 78 | 78 |
| March 31, 2014 | 81 | 81 |
| June 30, 2014 | 79 | 82 |
| September 30, 2014 | 74 | 84 |
| December 31, 2014 | 70 | 79 |
| March 31, 2015 | 67 | 75 |
| June 30, 2015 | 64 | 70 |
| September 30, 2015 | 72 | 69 |
| December 31, 2015 | 56 | 69 |
| March 31, 2016 | 58 | 72 |

39.     At its meeting on May 26, 2016 to review the Plan's First Quarter 2016 performance, the Committee should have reviewed the long-term trend established by the Freedom funds' persistent failure to satisfy the criteria articulated in the IPS and immediately determined to investigate alternatives.  The minutes for that meeting, however, contain no substantive discussion of the Freedom funds or their performance issues.  Nor do they offer any

justification for retaining the embattled suite.  This betrays a concerning neglect on the part of Defendants, who inexplicably ignored the continued inability of the Freedom funds to generate returns that regularly beat their peers.

40.     This negative trend was also apparent in the suite's risk-adjusted returns, another evaluative criteria prescribed by the IPS.  In concert with a TDF's actual return, risk-adjusted returns can control for any differences in asset allocation among comparators used for evaluation (like a broad peer group).  The Sharpe ratio metric accounts for differing levels of risk by measuring the performance of an investment, such as a TDF, compared to the performance of similar investments, after adjusting for risk.  More specifically, the Sharpe ratio represents the additional amount of return that an investor receives per unit increase of risk.  The Sharpe ratio is computed by comparing a fund manager's outperformance of the risk-free rate to the standard deviation of the manager's performance.  Applied to TDFs, this metric enables the comparison of suites with disparate equity and fixed income allocations as well as both "to" and "through" management styles (each resulting in varying levels of risk) by controlling for those differences. In comparing two TDFs, the Sharpe ratio enables plan fiduciaries to determine whether Manager A, which has assumed greater risks than manager B, is appropriately compensating investors in the form of relatively superior returns.  In other words, the Sharpe ratios can teach investors and responsible fiduciaries whether the investment they are considering is worth it compared to other readily available investments.  Evaluation of the Sharpe ratio, like rolling three- and five-year trailing returns, is explicitly prescribed in the Plan's IPS.

41.     The below chart provides the average trailing three-year Sharpe ratio of the Freedom funds for the same time period as the returns chart above, all of which were available to Defendants in real time at the points in time they made the decisions to retain the Freedom funds.

| Three-Year Average Sharpe Ratio Relative to Peer Median ||
| As of | Three-Year Out or Underperformance |
| --- | --- |
| March 31, 2012 | 0.01 |
| June 30, 2012 | 0.01 |
| September 30, 2012 | 0.00 |
| December 31, 2012 | (0.02) |
| March 31, 2013 | (0.03) |
| June 30, 2013 | (0.05) |
| September 30, 2013 | (0.03) |
| December 31, 2013 | (0.05) |
| March 31, 2014 | (0.07) |
| June 30, 2014 | (0.04) |
| September 30, 2014 | (0.04) |
| December 31, 2014 | (0.03) |
| March 31, 2015 | (0.02) |
| June 30, 2015 | (0.02) |
| September 30, 2015 | (0.08) |
| December 31, 2015 | (0.01) |
| March 31, 2016 | (0.03) |

42.     As with the Freedom funds' actual returns, the Committee demonstrably failed to recognize the negative trend demonstrated by the suite's persistent inability to exceed the median Sharpe ratio of peer TDFs.  The minutes for the Committee's May 26, 2016 meeting contain no substantive discussion of the Freedom funds' risk-adjusted returns.  Either trend of underperformance alone, whether on an actual or risk-adjusted basis, should have raised alarm bells for prudent fiduciaries.  That both red flags were present here, but were ignored, demonstrates that Defendants were either asleep at the switch or willfully ignored widely utilized investment evaluation metrics in their continued review of the suitability of the Freedom funds for the Plan.  Defendants' confounding refusal to replace the suite by the start of the Class Period represents a severe breach of fiduciary duty.  Moreover, these are not free-floating metrics selectively chosen by Plaintiffs, but rather the metrics Defendants themselves selected as

meaningful in the context of the Plan.  Consistent failures of the evaluative criteria selected by Defendants without any remedial action patently supports an inference of imprudence.

43.     Faced with such clear indicators of an investment's sustained struggles, prudent fiduciaries in Defendants' position at the start of the Class Period would have weighed the merits and features of all other available TDFs to determine a suitable alternative.  No such comparison was performed until 2018, at which point the Committee was furnished with a TDF analysis report by its investment advisor.  The report compared the Freedom funds to the FIAM Target Date funds (another TDF series offered by Fidelity), the Vanguard Target Retirement funds and American Funds Target Date funds.  These comparisons highlighted in particular the superiority of the American Funds TDFs, but such information was ignored by the Committee, and Defendants never investigated the American Funds TDFs, a clearly suitable alternative suite, or other suitable alternatives any further.

44.     Indeed, the information available to Defendants illustrated the clear outperformance of American Funds TDFs as of March 31, 2018 across most vintages over the trailing three-year period and across the entire suite over the trailing five-year period.

| Three-Year Return as of March 31, 2018 | | |
|---|---|---|
| Vintage | Fidelity Freedom | American Funds[13] |
| Income | 3.50% | |
| 2005 | 4.39% | |
| 2010 | 5.12% | 4.84% |
| 2015 | 5.84% | 5.18% |
| 2020 | 6.31% | 5.80% |
| 2025 | 6.72% | 6.75% |
| 2030 | 7.79% | 7.86% |
| 2035 | 8.59% | 8.86% |
| 2040 | 8.67% | 9.20% |
| 2045 | 8.65% | 9.41% |
| 2050 | 8.64% | 9.53% |
| 2055 | 8.64% | 9.51% |
| 2060 | 8.60% | 9.49% |

| Five-Year Return as of March 31, 2018 | | |
|---|---|---|
| Vintage | Fidelity Freedom | American Funds |
| Income | 3.75% | |
| 2005 | 4.97% | |
| 2010 | 5.91% | 6.06% |
| 2015 | 6.57% | 6.74% |
| 2020 | 7.09% | 7.60% |
| 2025 | 7.88% | 8.83% |
| 2030 | 8.82% | 9.94% |
| 2035 | 9.65% | 10.63% |
| 2040 | 9.76% | 10.93% |
| 2045 | 9.82% | 11.07% |
| 2050 | 9.84% | 11.12% |
| 2055 | 9.94% | 11.12% |
| 2060 | n/a | n/a |

[13]The American Funds TDF suite does not offer a Retirement/Income or 2005 vintage. Despite not offering a vintage for investors who retired in 2005, each American Funds TDF vintage continues its dynamic asset allocation until 30 years into retirement (e.g., the allocations to equities, fixed income and cash in the 2010 vintage will continue to shift until 2040).

45.     The information available to Defendants also indicated that the TDFs offered by American Funds and Vanguard consistently ranked highly compared to the Freedom funds and other peers on the basis of five-year rolling Shape ratios.  The chart comparing rolling Sharpe ratios showed both American Funds and Vanguard ranking no worse than the top 40th percentile for the entire period (June 2012 through June 2017) and in the top 20% from at least March 2014 onwards.  In contrast, the Freedom funds languish below the peer median for much of the period. Minutes of contemporaneous meetings reflect that the Committee failed to evaluate or consider the Freedom funds and potential alternatives on the basis of this criterion, which Defendants themselves selected as relevant under the IPS.

46.     The information available to Defendants also reflected each suite's ability to participate in market rallies and provide downside protection when markets fall, which is expressed in the average upside and downside capture ratios of an investment.  American Funds historically provided better upside participation and greater downside protection than the other three suites; downside protection is particularly important in a QDIA, which accumulates the assets of many unsophisticated participants who, in the opinion of Morningstar analyst Jeff Holt, tend to believe that TDFs are designed to "not lose money."

47.     Despite the American Funds TDFs' greater trailing returns, far superior rolling risk-adjusted returns, greater participation in bull markets and better protection from bear markets than the Freedom funds, as well as the investment advisor's accompanying recommendation that the Committee evaluate the American Funds TDFs, the Committee failed to assess any potential alternative to the Freedom funds, including whether Plan participants might be better served by the American Funds TDFs.  Indeed, the minutes of the June 1, 2018 meeting at which the TDF analysis was ostensibly presented not only contain no mention of the

alternative TDFs presented in the study, they demonstrate the Committee's ignorance of the standards articulated in its own IPS. The minutes' only note concerning the TDF analysis mentions that the Freedom funds performed the best of the comparators *over the last year*. Nowhere is any acknowledgement of the three- and five-year returns (which are recognized as *more meaningful* by the Plan's IPS) or the Sharpe ratio or up/down capture ratio analyses presented, or any suggestion that the Committee discussed, scrutinized, or considered the information offered in the TDF analysis.

48.     In fact, the cursory minutes of the Committee's meetings—which occurred with less frequency than is typical of fiduciaries of plans as large as the Plan—betray a glaring lack of substantive discussion of the Freedom funds during the Class Period. Indeed, the minutes do not reflect considered evaluation of the very criteria articulated in the Plan's IPS, which would have revealed the unsuitability of the Freedom funds. This miscarriage of Defendants' investment monitoring responsibilities is all the more inexcusable given the importance of the Freedom funds within the Plan's structure owing to their designation as QDIA. Without meaningful discussion of the qualitative and quantitative issues attending to the Freedom funds during the Class Period, Defendants could not have effectively monitored the funds and, here, failed to replace the funds with more suitable alternative investments. This failure caused the Plan to suffer considerable losses in the form of missed capital appreciation for participant retirement savings. Taking one potential suitable alternative as an example, applying the delta between the returns generated by the American Funds TDFs and the Freedom funds over the Class Period to the considerable Plan assets in the latter yields a loss in excess of $10 million to the Plan.

49.     Any objective evaluation of the Freedom funds would have resulted in the selection of a more consistent, better performing, and more appropriate TDF suite. Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the

participants, they would have come to this conclusion at the start of the Class Period and acted upon it.

### iii.    Investors Have Lost Faith in the Freedom Funds

50.    The flow of funds to or from target date families is one indicator of the preferences of investors at large.  Following the strategy changes in 2013 and 2014, consistently underwhelming performance, and media scrutiny, investor confidence in the Freedom funds has deteriorated: from 2016-2020, the suite lost an estimated $35 billion in net outflows.[14]



51.    That undeniable response by the market as to the suitability of the Freedom funds should have been a clear signal that it was imprudent for Defendants to continue offering the suite as an investment in the Plan, as opposed to other TDFs (both active and passive) that were readily available and more suitable.  Indeed, the Plan's IPS explicitly recognizes as a watchlist criteria any significant shift in the assets under management of a Plan investment.  No minutes of any Committee meeting during the relevant period contain any mention of the substantial and

---

[14] MORNINGSTAR, 2021 TARGET-DATE STRATEGY LANDSCAPE (2021).

consistent capital outflows from the Freedom funds.  Defendants' conduct in offering and maintaining the Freedom funds in the Plan evidences their failure to acknowledge or act upon investors' crumbling confidence in the suite.  Had Defendants opted to replace the Freedom funds with any of a number of more suitable alternative TDFs, including, for example, the American Funds TDFs, they would have avoided considerable losses to the Plan.

## V.     ERISA'S FIDUCIARY STANDARDS

52.     ERISA imposes strict fiduciary duties of prudence and loyalty upon the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)    for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan;
>
> > [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

53.     Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

54.     Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

55.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.  *Donovan*, 680 F.2d at 271–272 n. 8.

56.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  Section 405(a) of ERISA, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)   if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

57.     Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of

the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.    **CLASS ALLEGATIONS**

58.     This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed Class:

> All participants and beneficiaries in the DISH Network Corporation 401(k) Plan (the "Plan") at any time on or after January 21, 2016 and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

59.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

60.     **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

61.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)     Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)       Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)       Whether and what form of relief should be afforded to Plaintiffs and the Class.

62.       **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.  In addition, Plaintiff seeks relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

63.       **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

64.       **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

65.       **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the

vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

66.     **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

67.     **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

68.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

69.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of

Civil Procedure. Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

70.     Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

## <u>COUNT I</u>
### (For Breach of Fiduciary Duty)

71.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

72.     Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and: (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the Plan; with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and (c) by failing to act in accordance with the documents and instruments governing the Plan. In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

73.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to

his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

74.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

75.     Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

76.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

77.     DISH is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

78.     In light of its appointment and supervisory authority, DISH had a fiduciary responsibility to monitor the performance of the Committee and its members.  In addition, DISH, and the Administrative Committee had a fiduciary responsibility to monitor the performance of the members of the Committee.

79.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

80.     To the extent that fiduciary monitoring responsibilities of DISH or the Committee was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

81.     DISH and the Committee breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and  omissions with respect to the Plan;

(b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

82.     As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had DISH and the Committee discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

83.     DISH and the Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other

equitable or remedial relief as appropriate.

84.     Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

85.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

86.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

87.     To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay excessive recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand

judgment against Defendants for the following relief:

    a.  Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

    b.  Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

    c.  Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

    d.  Attorneys' fees, costs and other recoverable expenses of litigation; and

    e.  Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## <u>NOTICE PURSUANT TO ERISA § 502(h)</u>

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: April 10, 2023          Respectfully submitted,

                      /s/ James E. Miller
                      James E. Miller
                      Laurie Rubinow
                      MILLER SHAH LLP
                      65 Main Street
                      Chester, CT 06412
                      Telephone: (866) 540-5505
                      Facsimile: (866) 300-7367
                      Email: jemiller@millershah.com
                              lrubinow@millershah.com

James C. Shah
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
         ajberin@millershah.com

Kolin C. Tang
MILLER SHAH LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

Mark K. Gyandoh
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com

Donald R. Reavey
CAPOZZI ADLER, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*