**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00167-CMA-STV

LAQUITA JONES, *et al.*, Individually and as representatives of a class of similarly situated persons, on behalf of the DISH NETWORK CORPORATION 401(k) PLAN,

      Plaintiffs,

      v.

DISH NETWORK CORPORATION, *et al.*,

      Defendants.

---

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
AMENDED CLASS ACTION COMPLAINT**

---

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ...................................................................................................... 3

LEGAL STANDARD ............................................................................................... 4

ARGUMENT ........................................................................................................... 5

    I.  Plaintiffs Fail to State an Imprudence Claim Based on the Freedom Funds .......... 5

        A.  Plaintiffs' Peer Group Ranking Allegations Are Deficient. ............................... 8

        B.  Plaintiffs' Sharpe Ratio Allegations Are Deficient. ......................................... 12

        C.  Plaintiffs' Allegations That the Freedom Funds' Underperformed the American TDFs Are Deficient. ...................................................................... 13

        D.  Plaintiffs' Recycled Allegations Regarding Excessive Risk, Outflows, and Media Coverage Are Deficient for the Same Reasons the Court Previously Rejected Them. ............................................................................................ 18

    II.  Plaintiffs' Mischaracterization of the Plan's IPS and Nitpicking of the Committee Meeting Minutes Cannot Salvage Their Claims. ................................................... 19

    III. Plaintiffs' Disloyalty Claim and Derivative Claims Fail. ........................................ 22

CONCLUSION ...................................................................................................... 23

Pursuant to Federal Rule of Civil Procedure 12(b)(6), D.C.COLO.LCivR. 7.1, and CMA Civ. Practice Standard 7.1B, Defendants DISH Network Corporation ("DISH"), the Board of Directors of DISH, and the DISH 401(k) Plan Committee ("Committee" and, collectively, "Defendants") respectfully move the Court for an order dismissing Plaintiffs' Amended Class Action Complaint (Dkt. 80) ("Amended Complaint") with prejudice.

## **INTRODUCTION**

On March 27, 2023, the Court adopted Magistrate Judge Varholak's Recommendation (Dkt. 72) ("Rec.") and dismissed Plaintiffs' original Class Action Complaint without prejudice.  *See* Dkt. 79 ("Order").  Plaintiffs then filed the Amended Complaint on April 10, 2023.  The Amended Complaint repeats many of the same deficient allegations the Court has already rejected, and it should be dismissed with prejudice.

In the Amended Complaint, Plaintiffs again claim that Defendants breached their duty of prudence under ERISA by offering the Fidelity Freedom Funds ("Freedom Funds") as an investment option in the DISH 401(k) Plan ("Plan").  This time, Plaintiffs drop their allegations that the Freedom Funds had excessive fees and claim imprudence based solely on the funds' alleged "underperformance."[1]  The Court should dismiss Plaintiffs' claims on that basis alone.  This Court (and many others) have found that merely alleging that a challenged fund did not perform as well as another fund selected by plaintiffs with the benefit of hindsight cannot state an imprudence claim.  *See Birse v. CenturyLink, Inc.*, No. 17-cv-02872, 2019 WL 1292861, at *4-5 (D. Colo. Mar. 20, 2019) ("It is not sufficient to simply allege that an investment did poorly, and, therefore, a plaintiff was harmed. . . . [R]elative underperformance is insufficient to state a breach of fiduciary duty claim.")

---

[1] Plaintiffs also have abandoned their claims regarding the Royce Total Returns Fund and the Plan's recordkeeping fees.

Putting that threshold flaw aside, Plaintiffs' underperformance allegations are insufficient for several reasons. Plaintiffs allege that the Freedom Funds underperformed an unspecified "peer group" and one target date fund series, the American Funds Target Date Funds ("American TDFs"). But Plaintiffs make no effort to allege why either of these comparators is a meaningful benchmark for assessing the Freedom Funds' performance, as the law requires. Plaintiffs do not even say which funds the so-called "peer group" is comprised of, let alone that they are comparable to the Freedom Funds. Even if Plaintiffs' comparators were appropriate, the Amended Complaint once again alleges underperformance over arbitrary snapshots in time, failing to allege anything about the Freedom Funds' performance for most of Plaintiffs' proposed class period. The Court already rejected this approach in dismissing the original Complaint. Moreover, Plaintiffs' own allegations show that the Freedom Funds sometimes outperformed Plaintiffs' comparators, and any underperformance was well below the threshold the Court already held was too minor to state a claim.

Plaintiffs' remaining allegations fare no better. Plaintiffs assert that the Committee did not follow the Plan's Investment Policy Statement and quibble that the Committee's meeting minutes were not neatly typewritten. In reality, these documents—which Plaintiffs fail to attach to the Amended Complaint—and Plaintiffs' own allegations show a prudent and thorough monitoring process in which the Committee worked with its professional investment advisor to evaluate the Freedom Funds in detail against alternative funds and peer groups. Beyond that, Plaintiffs simply regurgitate the same allegations that the Freedom Funds were "excessively risky," had "outflows," and received negative media coverage—all of which the Court previously rejected. Plaintiffs' disloyalty

claim and derivative claims also fail for the same reasons the Court dismissed them in the original Complaint.

## **BACKGROUND**

DISH sponsors the Plan to help its employees save for retirement.  Am. Compl. ¶ 21.  Plan participants can contribute a portion of their salaries to their individual accounts in the Plan.  *Id.*  DISH also makes voluntary matching contributions in the form of company stock to benefit the participants' retirement savings.  *Id.*

Among other investments, the Plan offers the Freedom Funds, a series of target-date funds.  *Id.* ¶ 31.  Target-date funds are "investment vehicle[s] that offer[] an all-in-one retirement solution through a portfolio of underlying funds that gradually shift[] to become more conservative as the assumed target retirement year approaches."  *Id.*  Fidelity is the second-largest target-date fund provider, *see id.* ¶ 32, and the Freedom Funds are the second-most widely held target-date series in the marketplace, *see* Ex. 1, Morningstar, 2021 Target-Date Strategy Landscape ("2021 Morningstar Report") at 8; Dkt. 30-09, Morningstar, 2019 Target-Date Fund Landscape ("2019 Morningstar Report") at 44-45.[2]  Consistent with their market-leading status, between 2015 and 2017, the Freedom Funds "outperformed at least 85 percent of their competitors."[3]

---

[2] The 2021 Morningstar Report is cited in the Amended Complaint, Am. Compl. ¶ 50 n.14, and therefore is properly considered on a motion to dismiss.  *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[3] Reuters, *Special Report: Fidelity puts 6 million savers on risky path to retirement* (Mar. 5, 2018), https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-reportfidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI    (cited Am. Compl. ¶ 36 n.8).

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a court must accept well-pled facts as true, "conclusory allegations are not entitled to be presumed true."  *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1191 (D. Colo. 2021) (citing *Iqbal*, 556 U.S. at 681).  Courts also should not accept as true allegations that contradict documents properly subject to judicial notice or referenced in the complaint.  *See GFF Corp.*, 130 F.3d at 1384.

Courts must take "particular care" in applying these standards to ERISA claims. *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) ("*St. Vincent*").  That is because "the prospect of discovery" in an ERISA class action is "ominous" and "elevates the possibility that a 'plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value[.]'"  *Id.* at 719 (alteration in original).  Courts therefore must engage in "careful, context-sensitive scrutiny of a complaint's allegations" to assess whether an ERISA plaintiff has stated a plausible claim.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  Recognizing that "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs," the Supreme Court has instructed that, at the motion to dismiss stage, "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."  *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022).

## ARGUMENT

**I.      Plaintiffs Fail to State an Imprudence Claim Based on the Freedom Funds.**

As this Court explained, "to establish a claim for breach of the duty of prudence and failure to monitor, a plaintiff must allege facts plausibly establishing that ***no reasonable fiduciary*** would have maintained the investment.  It is insufficient to simply allege that an investment did poorly, and therefore a plaintiff was harmed."  Order at 13-14.  Plaintiffs' claims fall well short of satisfying this standard.

In the Amended Complaint, Plaintiffs abandon their excessive fee claim.  The basis for their imprudence claim is that the Freedom Funds allegedly underperformed Plaintiffs' chosen comparators.  In recommending dismissal of the original Complaint, Magistrate Judge Varholak rightly was wary of imprudence claims based on underperformance, citing this Court's decision in *Birse*: "To be sure, a showing of imprudence does not 'come down to simply pointing to a fund with better performance.'  *Smith*, 37 F.4th at 1167; *see also Birse*, 2019 WL 1292861, at *5 (holding that 'relative underperformance is insufficient to state a breach of fiduciary duty claim')."  Rec. at 31-32.  Many courts in other target-date fund ("TDF") lawsuits likewise have held that alleging underperformance alone cannot state a claim.  As the Sixth Circuit explained in rejecting a similar challenge to the Freedom Funds:

> Nor does a showing of imprudence come down to simply pointing to a fund with better performance.  We accept that pointing to an alternative course of action, say another fund the plan might have invested in, will often be necessary to show a fund acted imprudently (and to prove damages).  But that factual allegation is not by itself sufficient. . . . Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty.

*Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022); *see also Riley v. Olin Corp.*, No. 4:21-cv-1328, 2023 WL 371872, at *5 (E.D. Mo. Jan. 24, 2023) ("In short, performing below average does not, in and of itself, an ERISA violation make."). Two district courts in three separate lawsuits recently agreed in dismissing similar claims involving TDFs with prejudice. *See Hall v. Cap. One Fin. Corp.*, No. 1:22-cv-857, 2023 WL 2333304, at *6 (E.D. Va. Mar. 1, 2023) ("ERISA simply does not provide a cause of action for fiduciary breaches based solely on a fund participant's disappointment in the fund's performance."); *Tullgren v. Booz Allen Hamilton*, No. 1:22-cv-856, 2023 WL 2307615, at *6 (E.D. Va. Mar. 1, 2023) (same); *Beldock v. Microsoft Corp.*, No. C22-1082, 2023 WL 3058016, at *3 (W.D. Wash. Apr. 24, 2024) ("Plaintiffs' allegations, which again are based solely on the BlackRock TDFs' alleged poor performance during a brief timeframe, are insufficient, without more, to raise Plaintiffs' claim above the level of speculation and into plausibility.").

Plaintiffs ignore these principles, challenging the Freedom Funds based solely on performance. Plaintiffs window dress their previously dismissed underperformance claims by adding allegations about performance relative to an unspecified peer group and risk-adjusted performance expressed as "Sharpe ratios." But, as one court explained recently in rejecting a similar claim involving TDFs, that is just a repackaging of Plaintiffs' original underperformance theory: "the Sharpe ratio metric . . . [is] 'merely [an] additional measurement[] of investment performance' beyond those Plaintiffs included in their original complaint[,]" and "courts across the country have rejected claims . . . of [im]prudence under ERISA where the plaintiffs allege nothing more than underperformance relative to other investment vehicles." *Beldock*, 2023 WL 3058016, at

*3.  Plaintiffs' reliance solely on underperformance allegations is, by itself, grounds for dismissing their imprudence claim.

Even if allegations of underperformance alone could be enough, Plaintiffs' allegations fail to state a claim.  "To make a plausible allegations that a prudent fiduciary would have taken a different course 'based on the cost or performance of the selected fund[s], a plaintiff must provide a sound basis for comparison—a meaningful benchmark.'" Rec. at 25 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)). "[S]imply labeling funds as 'comparable' or 'materially similar' is insufficient to establish that those funds are meaningful benchmarks."  *Tobias v. NVIDIA Corp.*, No. 20-cv-6081, 2021 WL 41487-06, at *13 (N.D. Cal. Sept. 13, 2021).

Plaintiffs fail to allege a meaningful benchmark for the Freedom Funds from which the Court could find underperformance.  Instead, Plaintiffs often make blanket assertions unsupported by any factual allegations.  For example, they assert: "Prior to and throughout the Class Period, there were other TDFs that consistently outperformed the Freedom Funds."  Am. Compl. ¶ 38.  Elsewhere, Plaintiffs assert: "Defendants should have considered the merits and features of all available TDF options, but failed to compare the Freedom funds to all other available TDFs[.]"  *Id.* ¶ 32.  But Plaintiffs do not identify any other TDF that "consistently outperformed" the Freedom Funds "throughout the Class Period."  Regardless, the law is clear that fiduciaries do not have to "scour the market" of all TDFs and choose the best performing fund.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020).

Apart from these blanket assertions, the only comparators the Amended Complaint actually offers are **one other TDF** and a supposed "peer group" that Plaintiffs make no

effort to identify or define.  Plaintiffs fail to plausibly allege that these comparators are meaningful benchmarks for the Freedom Funds.  Even if they were, Plaintiffs allege nothing about the Freedom Funds' performance against any comparator for most of the proposed class period.  What underperformance Plaintiffs do allege is too minor to state a claim, as the Court recognized in dismissing the original Complaint.

### A.     Plaintiffs' Peer Group Ranking Allegations Are Deficient.

Plaintiffs first attempt to plead underperformance based on the Freedom Funds' alleged investment return rankings compared to an unspecified "peer group."  Am. Compl. ¶¶ 38-39.  They allege that "by the start of the Class Period in January 2016, the Freedom funds had persistently failed to exceed the median three- and five-year trailing returns of peer TDFs for sixteen consecutive quarters through December 31, 2015."  *Id.* ¶ 38.  These allegations cannot state a claim for multiple reasons.

***First***, Plaintiffs fail to allege that the supposed peer group is a meaningful benchmark.  As Plaintiffs acknowledged in the original Complaint and the Department of Labor has explained, two TDFs with the same target date often use different investment management strategies (e.g., investing in actively-managed versus passively-managed funds), have different asset allocations (e.g., equity versus fixed income), charge different fees, and follow different "glide paths"—i.e., how and when the manager for the fund adjusts the underlying asset mix over time.[4]  In other words, not all TDFs are comparable to each other, even though they fall under the broad category of "target date funds."  Yet,

---

[4] *See* Class Action Compl. (Dkt. 1) ¶¶ 60, 63, 66-68, 72-73, 76; U.S. Dep't of Labor, *Target Date Retirement Funds—Tips for ERISA Plan Fiduciaries* 1 (Feb. 2013), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf).

there are zero allegations in the Amended Complaint of which funds are even in Plaintiffs' peer group, let alone that these funds had similar investment strategies, asset allocations, risk profiles, or glide paths as the Freedom Funds.  *See Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022) (finding that a meaningful benchmark must "hold similar securities, have similar investment strategies, and reflect a similar risk profile" to the challenged fund).

Courts have repeatedly rejected similar claims based on underperformance compared to alleged peer groups with these pleading deficiencies.  *See, e.g.*, *Matousek*, 51 F.4th at 281 (holding that plaintiffs failed to allege that "peer groups" were meaningful benchmarks where "the peer group for each contains hundreds of funds[,]" and plaintiffs gave "no explanation of what types of funds are in each group, much less the criteria used to sort them"); *Williams v. Centene Corp.*, No. 4:22-cv-216, 2023 WL 2755544, at *5 (E.D. Mo. Mar. 31, 2023) (holding that plaintiffs failed to plausibly allege meaningful benchmarks where they "merely allege[d] that the challenged and comparator funds are 'in the same investment style,'" and "provide[d] no information regarding any of the funds' holdings, investment style, or strategy"); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1150-51 (N.D. Cal. 2022) (holding that Morningstar "peer group category" was not a meaningful benchmark because it "is an average of a large group of TDFs[,]" and "[t]he TDFs in these categories could all have differing aims, risks, and rewards than the [TDFs at issue]").

***Second***, even if the "peer group" were an appropriate benchmark, Plaintiffs allege ***almost nothing*** about the Freedom Funds' performance relative to the peer group ***during their proposed class period***.  ERISA's statute of repose requires that a plaintiff

file suit within six years of the last act or omission constituting a breach.  *See* 29 U.S.C. § 1113.  Acknowledging that, Plaintiffs selected a six-year proposed class period starting on January 20, 2016.  Am. Comp. ¶ 1.  Yet, there are virtually no allegations about the performance of the Freedom Funds during Plaintiffs' proposed class period. Comparisons to the alleged peer group's performance in 2012 to 2015 have no bearing on the Committee's monitoring process or the prudence of investment options from 2016 to the present.

The Amended Complaint's omission of the Freedom Funds' performance for most of the proposed class period likely was not an accident.  A review of the first quarter 2018 Investment Management Review from the Committee's investment advisor—which Plaintiffs specifically reference in the Amended Complaint—details the Freedom Funds' ***favorable performance compared to peer groups***.[5]   Ex. 2, First Quarter 2018 Inv. Mgmt. Rev. at p. 61-64 (showing that most of the Freedom Fund vintages outperformed peer groups on 1-year, 3-year, 5-year, and 10-year trailing bases); *see also* Ex. 3, June 1, 2018 Comm. Mtg. Mins. (showing that the Committee thoroughly reviewed the report). The Freedom Funds' positive performance improved even more in subsequent years. For example, by the second quarter of 2021, the investment advisor's report showed that nearly all of the Freedom Fund vintages outperformed peer groups on 1-year, 3-year, 5-year, and 10-year trailing bases.  *See, e.g.*, Ex. 4, Second Quarter 2021 Inv. Mgmt. Rev.

---

[5] The First Quarter 2018 Investment Manager Review and June 1, 2018 Committee meeting minutes are cited in the Amended Complaint, Am. Compl. ¶¶ 43, 47, and thus are properly considered on a motion to dismiss.  *See GFF Corp.*, 130 F.3d at 1384.

at 38-39; Ex. 5, Sept. 23, 2021 Comm. Mtg. Mins. (reviewing and citing to specific pages in the investment advisor's report, including the Freedom Fund analysis).[6]

      ***Third***, even taking Plaintiffs' peer group ranking chart at face value, it shows average performance by the Freedom Funds during many of the quarters. *See* Am. Compl. ¶ 38. Plaintiffs' theory that a fund needs to be at the top of its peer group to be prudent is contrary to the law and makes no practical sense. It is well-settled that fiduciaries are not required to pick the best performing funds. *See Meiners*, 898 F.3d at 823 ("[n]o authority requires a fiduciary to pick the best performing fund"). ERISA "requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990). Moreover, "the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers." *Patterson v. Morgan Stanley*, No. 16-cv-6568, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019). The implication of Plaintiffs' theory—that any fund that does not rank at the top of its peer group is *per se* imprudent—would mean 75% or more of funds in the market are imprudent. That is an absurd result, as fiduciaries often have "long-range investment strateg[ies]," which "plainly permit[]" the "common practice of retaining investments through periods of under-performance." *White v. Chevron Corp.*, No. 16-cv-793, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017). And it is not the law in this

---

[6] Plaintiffs repeatedly refer to the "any" or "each" of the "Committees meeting minutes" during the "relevant period" or "Class Period[,]" Am. Compl. ¶¶ 30, 37-38, 48, 51, which, in turn, refer to the investment management reviews. For these reasons, the Court may consider the second quarter 2021 Investment Management Review and the September 23, 2021 Committee meeting minutes. *See GFF Corp.*, 130 F.3d at 1385 ("If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied. . . . [T]he plaintiff is obviously on notice of the document's contents" and the rationale "for conversion to summary judgment dissipates.").

Court.  *See* Order at 13-14 ("[T]o establish a claim for breach of the duty of prudence and failure to monitor, a plaintiff must allege facts plausibly establishing that no reasonable fiduciary would have maintained the investment.").

**B.    Plaintiffs' Sharpe Ratio Allegations Are Deficient.**

Plaintiffs' allegations comparing the Freedom Funds' Sharpe ratios to those of Plaintiffs' "peer group" suffer from the same flaws discussed above.  Sharpe ratios measure a fund's risk-adjusted investment returns, Am. Compl. ¶ 41—i.e., they are another way of expressing a fund's performance.  "The Sharpe ratio metric accounts for differing levels of risk by measuring the performance of an investment, such as a TDF, compared to the performance of similar investments, after adjusting for risk."  *Id.* ¶ 40. Plaintiffs contend that the Freedom Funds' "persistent inability to exceed the median Sharpe ratio of peer TDFs" demonstrates imprudence.  *Id.* ¶¶ 41-42.  Like their peer group ranking allegations, Plaintiffs' Sharpe ratio allegations are deficient because they make zero attempt to show what the so-called peer group is comprised of, let alone that it is an appropriate benchmark.  And, again, the data that Plaintiffs present is almost completely for quarters outside of the proposed class period.  *Id.* ¶ 42.

Other courts have rejected underperformance allegations based on Sharpe ratios in TDF lawsuits where, as here, there are no allegations that the comparators are appropriate and no allegations of imprudence beyond underperformance.  *See Anderson v. Intel Corp.*, No. 19-cv-4618, 2021 WL 229235, at *7-8 (N.D. Cal. Jan. 21, 2021) (holding that plaintiffs' reliance on risk-adjusted returns (i.e., what Sharpe ratios track) was insufficient because plaintiffs had not shown "that these other funds cited [we]re adequate benchmarks."); *Beldock*, 2023 WL 3058016, at *3 (dismissing plaintiffs' imprudence claims challenging TDFs based on underperformance where the amended complaint

added a Sharpe ratio metric that was "merely additional measurements of investment performance"); *see also Hall*, 2023 WL 2333304, at *6 (dismissing plaintiff's imprudence claim challenging TDFs based in part on deficient Sharpe ratio allegations); *Tullgren*, 2023 WL 2307615, at *6 (same).

Finally, even accepting Plaintiffs' Sharpe ratio chart, it shows the Freedom Funds performing positively based on this metric for much of 2012 and shows only modest differences compared to the alleged peer median in other years.  *See* Am. Compl. ¶ 42. In short, these allegations do not come close to stating a plausible claim that the Committee's process for monitoring the Freedom Funds was deficient, let alone that the Committee was "asleep at the switch," as Plaintiffs dramatically insist.

### C.   Plaintiffs' Allegations That the Freedom Funds' Underperformed the American TDFs Are Deficient.

Plaintiffs' allegations that the Freedom Funds underperformed the American TDFs and that the Committee should have replaced them are insufficient to show that the Committee was imprudent.  ***First***, Plaintiffs' own allegations show that the Committee's process was thorough and prudent, not imprudent.  Plaintiffs allege that in 2018, "the Committee was furnished with a TDF analysis report by its investment advisor[,]" evaluating the Freedom Funds and comparing them to "the [Freedom Index Funds] (another TDF series offered by Fidelity), the Vanguard Target Retirement funds and American [TDFs]."  *Id.* ¶ 43.  Plaintiffs insist "[t]hese comparisons highlighted in particular the superiority of the [American TDFs], but such information was ignored by the Committee, and Defendants never investigated the [American TDFs]" further.  *Id.*

In other words, according to Plaintiffs, the Committee needed to reevaluate offering the Freedom Funds in the Plan—but Plaintiffs' allegations show that the Committee ***did***

13

*just that*.  Not only that, the Committee worked with its professional investment advisor, who provided a special report on the Freedom Funds, which included copious data and details, and evaluated the Freedom Funds against multiple alternative funds.  In fact, the Committee meeting minutes show that the Committee reviewed the report and—as Plaintiffs admit—noted that the "Freedom funds performed the best of the comparators *over the last year*."  Am. Compl. ¶ 47; *see* Ex. 3 at 2.  The report, among other things, analyzed the pros and cons of the American TDFs, Plaintiffs' preferred fund.  Ex. 2 at 70-71.  The Freedom Funds outperformed the American TDFs in some metrics over some time periods and performed comparably or less well during other time periods.  *Id.* at 61-66.  The investment advisor did not recommend removing the Freedom Funds or replacing them with the American TDFs or any other TDFs.  *Id.* at 49, 71, 76.  Based on the information the Committee reviewed, it was well within the Committee's discretion and the "range of reasonable judgments" to continue offering the Freedom Funds in the Plan. *See Hughes*, 142 S. Ct. at 742.  Plaintiffs, with the benefit of hindsight, may have preferred to replace the Freedom Funds with the American TDFs, but that is not the legal standard. *See* Order at 13-14 ("[A] plaintiff must allege facts plausibly establishing that **no reasonable fiduciary** would have maintained the investment.") (emphasis added); *Hall*, 2023 WL 2333304, at *6 ("ERISA simply does not provide a cause of action for fiduciary breaches based solely on a fund participant's disappointment in the fund's performance.").

**Second**, putting aside that their own allegations demonstrate the Committee's prudence, Plaintiffs fail to meet their burden of alleging that the American TDFs are a meaningful benchmark for the Freedom Funds.  While they allege that the Plan's investment advisor offered the American TDFs as a potential alternative, Plaintiffs make

no allegations that the American TDFs meet the legal standard to establish a meaningful benchmark for a breach of fiduciary duty claim.  To plausibly allege that the American TDFs are a meaningful benchmark for that purpose, Plaintiffs were required to allege that they "hold similar securities, have similar investment strategies, and reflect a similar risk profile" as the Freedom Funds.  *See Matousek*, 51 F.4th at 281.  There are no such allegations in the Amended Complaint.  Courts in TDF cases regularly dismiss imprudence claims based on this pleading failure.  *See, e.g.*, *Smith*, 37 F.4th at 1167 (affirming dismissal and finding that plaintiff's comparators were "inapt" because "each fund ha[d] distinct goals and distinct strategies"); *Riley*, 2023 WL 371872, at *4 (dismissing claims where plaintiffs did "not allege anything about the funds' holdings, investment style, or strategy that shows how the comparator funds qualify as meaningful benchmarks"); *Hall*, 2023 WL 2333304, at *6 ("In dismissing the original Complaint . . . this Court concluded that the 'complaint lacks facts showing that the TDFs shared the same investment strategy, investment style, risk profile, or asset allocation [as Plaintiffs' comparators].' Plaintiffs have not remedied this deficiency in their Amended Complaint.").

**Third**, even if the American TDFs were an appropriate comparator, that the Freedom Funds allegedly underperformed **one other TDF** cannot show imprudence. There are over 60 TDF series in the market.[7]  Alleging that the Freedom Funds underperformed one out of 60 other TDFs does not suggest Defendants' monitoring process was flawed.  That amounts to the theory that a fiduciary must offer the best performing fund, which is contrary to the well-settled principle that courts cannot "infer imprudence every time a fiduciary retains a fund that fails to turn in best-in-class

---

[7] *See* 2019 Morningstar Report at 44-45.

performance for any specific period." *Coyer v. Univar Sols. USA Inc.*, No. 1:22-cv-362, 2022 WL 4534791, at *6 (N.D. Ill. Sept. 28, 2022) (citing *Meiners*, 898 F.3d at 823).

**Fourth**, Plaintiffs' allegations that the Freedom Funds underperformed the American TDFs ring hollow, given that they are based on one arbitrary snapshot in time early in the proposed class period—the first quarter of 2018—omitting the remaining four-plus years of the period. That is precisely the sort of opportunistic cherry-picking of short-term performance that this Court rejected in dismissing the original Complaint. *See* Order at 18-19 (agreeing with the Recommendation that Plaintiffs' allegations regarding 3-year and 5-year annualized returns for one quarter "are insufficient to show that Defendants engaged in an imprudent monitoring process"). Plaintiffs' failure to allege anything about the Freedom Funds' performance after the first quarter of 2018 is all the more glaring because Defendants provided Plaintiffs with all of the investment management reviews and Committee meeting minutes from 2016 to 2021. Plaintiffs ignored nearly all of this information in drafting the Amended Complaint.[8]

---

[8] In a footnote, Plaintiffs contend that "[a]ny suggestion that the performance of the Freedom Funds marginally improved during the Class Period cannot excuse the breach committed by Defendants at the start of the Class Period when they failed to investigate alternatives and replace the Freedom funds. . . . Doing so would inappropriately exonerate a breach through hindsight analysis." Am. Compl. ¶ 38 n.12. To start, Plaintiffs are all but **admitting** that the Freedom Funds' performance got even better as the proposed class period went on. And their assertion about "exoneration through hindsight" misses the point. Defendants do not argue that recent favorable performance by the Freedom Funds excused earlier underperformance. Defendants' argument—as shown herein—is that the Freedom Funds did not meaningfully underperform any comparator during any part of the proposed class period. Moreover, Plaintiffs' admission further underscores their opportunism. Plaintiffs chose to define the proposed class period from 2016 to the present, yet they make no allegations about how the Freedom Funds performed after 2018, even as they admit to knowing the performance improved in the later years. Finally, that the Freedom Funds performance improved over the course of the proposed class period underscores Defendants' point—and numerous courts' holdings—that plan fiduciaries should not shuttle funds in and out of a plan's lineup based on short-term fluctuations in performance.

Indeed, the one investment management review Plaintiffs focus on in the Amended Complaint (but do not attach) makes clear that Plaintiffs' allegations are baseless. That first quarter 2018 report shows multiple instances where the Freedom Funds performed comparably or better than the American TDFs. *See* Ex. 2 at 63-71. For example, it reveals that the Freedom Funds outperformed the American TDFs in multiple instances over 1-year and 3-year trailing bases. *Id.* at 61-63. And, most of the Freedom Fund vintages outperformed the American TDFs for the 2016 and 2017 calendar years. *Id.* at 64-66. Not only that, Plaintiffs leave out of the Amended Complaint what the report conveyed to the Committee about the Freedom Funds' performance compared to the investment advisor's other alternative funds—the Vanguard TDFs and the Freedom Index Suite. Notably, the report shows that the Freedom Funds often outperformed both of these funds on 1-year, 3-year, and 5-year trailing bases. *See id.*

**Finally**, even accepting Plaintiffs' performance chart and cherry-picked time period in the Amended Complaint, the allegations do not reflect the level of underperformance necessary to state an imprudence claim. According to Plaintiffs' chart, the Freedom Funds sometimes **outperformed** the American TDFs, and the alleged underperformance was minor, ranging from .03% to 1%. *See* Am Compl. ¶ 44. Such "underperformance" is well within the range that this Court concluded was insufficient to infer an imprudent fiduciary monitoring process. Indeed, in dismissing the original Complaint, the Court held that alleged underperformance as high as 3.5% was not enough to show that offering the Freedom Funds was imprudent. *See* Rec. 32-33; Order at 18-19.

> **D.      Plaintiffs' Recycled Allegations Regarding Excessive Risk, Outflows, and Media Coverage Are Deficient for the Same Reasons the Court Previously Rejected Them.**

The Amended Complaint trots out the same allegations from the original Complaint that the Freedom Funds were "unnecessary[ily] risk[y]" because of a so-called "strategy overhaul" where the fund managers moved to active asset allocation.  Am. Compl. ¶¶ 36-37.  The Court has already rejected these allegations as inadequate to state a claim.  As Magistrate Judge Varholak explained:

> Plaintiffs next find fault with the "level of risk" incurred by the Active Suite as compared to the Index Suite, and the ability of Active Suite managers to alter a fund's glidepath. . . . To permit a claim of imprudence because the Active Suite pursued its goal by taking on risk would seemingly imperil every actively managed fund in every plan. But, "[i]t's possible, indeed likely, that the absence of any actively managed funds suited for risk-tolerant investors would be imprudent." *Smith*, 37 F.4th at 1167. To many investors, the additional risk undertaken in order to—as Plaintiffs allege—"boost [participant] returns" and the ability for trained investment managers to—as Plaintiffs allege—"time market shifts in order to locate underpriced securities" **is a feature, not a bug**.

Rec. at 27-28 (emphasis added).  The Court agreed with that conclusion, Order at 16, and should reject these allegations again for the same reasons.

Plaintiffs also repeat their allegations about "outflows" from the Freedom Funds and negative media coverage, citing to the 2021 Morningstar Report and the same Reuters report they pointed to in the original Complaint.  *See* Am. Compl. ¶¶ 36-37, 50-51.  Here again, Magistrate Judge Varholak rejected these allegations in recommending dismissal of the original Complaint.  *See* Rec. at 30.  He reasoned that "[r]eports of a roughly 3% annual outflow over a handful of years does not support an actionable inference that Defendants imprudently failed to" monitor the Freedom Funds, and "a handful of skeptical reports does not create a duty to drop an investment, particularly when the expert consensus was clearly mixed."  *Id.*  The Court agreed and added that

"when the Reports are considered as a *whole*, rather than cherrypicked for statements supporting Plaintiffs' position, the Reports simply do not create a plausible inference that the Active Suite's reputation was so poor that no reasonable fiduciary would have retained it." Order at 18. In short, these allegations about outflows and media coverage are no more plausible than they were in the original Complaint, and they cannot support Plaintiffs' claim that retaining the Freedom Funds was imprudent.[9]

## II.     Plaintiffs' Mischaracterization of the Plan's IPS and Nitpicking of the Committee Meeting Minutes Cannot Salvage Their Claims.

In an effort to bolster their claims, Plaintiffs allege that "[a]n objective evaluation of the Freedom funds, consistent with the guidance set forth in Defendants' own IPS, would have resulted in" the removal of the Freedom Funds. Am. Compl. ¶ 33. The Plan's Investment Policy Statement, or "IPS," is "intended to assist the fiduciaries of the Plan in effectively supervising, monitoring, and evaluating the Investment Alternatives available to Participants." Ex. 6, 2016 IPS at 2. Plaintiffs assert that the IPS requires the Committee to evaluate the Plan's investments "on a recurring basis over trailing one-, three-, and five-year periods[,]" and "returns and risk-adjusted returns against those of the appropriate peer group[.]" Am. Compl. ¶¶ 26-27. It is clear from the face of the IPS— which Plaintiffs failed to attach to the Amended Complaint—that these allegations are

---

[9] Plaintiffs also make the novel claim that it was a breach of fiduciary duty to not offer all vintages of the Freedom Funds for a portion of the proposed class period. *See* Am. Compl. ¶ 31 n.7. Plaintiffs allege that "[f]rom prior to the start of the Class Period through October 2019, Defendants opted not to offer the full suite (i.e., 2020, 2025, 2030) and instead offered only those vintages with a target date at the beginning of each decade (i.e., 2020, 2030, 2040) and the Income fund." *Id.* Defendants are not aware of any authority holding that it is *per se* imprudent to offer TDF vintages at 10-year intervals instead of 5-year intervals. Nor do Plaintiffs offer any allegations regarding the Committee's process in making this decision. In any event, Plaintiffs acknowledge that the Committee changed to offering vintages at 5-year intervals during the proposed class period, rendering the issue moot. *See id.*

baseless.  Nowhere does the IPS require that a fund must be removed from the Plan if it underperforms a "peer group" for a certain number of quarters on any trailing basis.[10] *See generally* Ex. 6, 2016 IPS.  Rather, the IPS offers guidelines for the Committee to consider and provides that the Committee should exercise its judgment in selecting and monitoring funds:

> The decision to retain or terminate an Investment Alternative cannot be made by a formula. It is the Committee's confidence in the Investment Alternative's ability to perform in the future that ultimately determines the retention of the Investment Alternative. No one factor will be determinative, but a review of all of these factors together will form the basis for any Committee decision.

Ex. 6 at 5.  That is consistent with the Supreme Court's principle in *Hughes* that "courts must give due regard to **the range of reasonable judgments a fiduciary may make based on her experience and expertise**."  142 S. Ct. at 742 (emphasis added).

Regardless, an IPS is not a binding plan document, and the failure to follow an IPS is not a breach of fiduciary duty.  *See White v. Martin*, 286 F. Supp. 2d 1029, 1040 (D. Minn. 2003) ("[A] statement of investment policy is not required under ERISA; it is merely one way of fulfilling fiduciary obligations"); *Tussey v. ABB, Inc.*, 746 F.3d 327, 334 n.5 (8th Cir. 2014) (expressing "concern[] that construing all investor policy statements as binding plan documents will discourage their use"); *see also Falberg v. Goldman Sachs Group, Inc.*, No. 19-cv-9910, 2022 WL 4280634, at *11 (S.D.N.Y. Sept. 14, 2022) (finding that "an IPS is not required under ERISA").

Even if the IPS were a binding plan document, Plaintiffs' allegations show that the Committee satisfied its fiduciary duties and followed the IPS.  As discussed above,

---

[10] The IPS is cited in the Amended Complaint, Am. Compl. ¶¶ 26-30, 33, 38-40, 45, 47-48, 51, and therefore is properly considered on a motion to dismiss.  *See GFF Corp.*, 130 F.3d at 1384.

Plaintiffs acknowledge that the Committee retained an investment advisor to assist in evaluating and monitoring the funds in the Plan, which is indicative of a prudent process. *See* Am. Compl. ¶¶ 43, 47; *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 421 (4th Cir. 2007) (seeking independent expert advice "is evidence of a thorough investigation").  The Committee meeting minutes show that the performance of the Freedom Funds and the Plan's other funds was reviewed regularly during the proposed class period.  *See supra* at Part A.II.  And, just two years into the proposed class period, the Committee worked with its advisor to specially evaluate the Freedom Funds and compare them to other TDFs based on a variety of metrics, including 1-year, 3-year, and 5-year trailing performance and a Sharpe ratio analysis.  *See* Am. Compl. ¶ 43; Ex. 3; Ex 2 at 56-67.

Plaintiffs' nitpicking about the Committee's meeting minutes and meeting frequency is similarly unavailing.  Plaintiffs admit that the "Committee met several times during the Class Period" but fault the Committee for not meeting quarterly.  Am. Compl. ¶ 30.  According to Plaintiffs, "it is apparent from the minutes of each meeting, which amount to little more than brief, handwritten, shorthand bullet points, that no such careful evaluation occurred."  *Id.* ¶ 30 (footnote omitted).  There is no requirement that a plan committee meet quarterly, contrary to Plaintiffs' assertion.  Nor are there any length or formatting requirements for meeting minutes.  *See Falberg*, 2022 WL 4280634, at *13 (rejecting imprudence claim and reasoning: "[t]hat the meeting minutes do not reflect a particular level of detail with respect to the[] discussions—of the funds and their performance, as well as alternatives—does not mean the discussions did not happen, nor is it enough to suggest that the Committee's consideration of its investment options . . . was not sufficiently 'deliberative' or was otherwise imprudent").

What matters is whether the Committee followed a prudent process in monitoring the Plan's lineup, not whether meeting minutes are typed up in full sentences as opposed to bullet points.  Plaintiffs have failed to allege such a failure of process here, as demonstrated above.  Plaintiffs' allegations make clear that the Committee went above and beyond the IPS's guideline that "the Committee will, on at least an annual basis, evaluate each Investment Alternative[.]"  Ex. 6 at 4.  And, as shown above, the Committee meeting minutes reflect a thorough review of the detailed reports prepared by the investment advisor, which analyzed the performance of the very funds Plaintiffs challenge on a quarterly basis.  *See supra* at Part A.II.  While Plaintiffs insinuate that the Committee did not review these reports, the meeting minutes tell a different story.  For example, the meeting minutes from May 26, 2016 and August 21, 2016—which Plaintiffs reference in the Amended Complaint—repeatedly refer to the investment management reviews, noting the specific page numbers and the key takeaways for each fund.  *See* Ex. 7, May 26, 2016 Comm. Mtg. Mins. at 2-3; Ex. 8, August 31, 2016 Comm. Mtg. Mins. at 1-2; Ex. 9, First Quarter 2016 Inv. Mgmt. Rev.; Ex. 10, Second Quarter 2016 Inv. Mgmt. Rev.[11]

## III.    Plaintiffs' Disloyalty Claim and Derivative Claims Fail.

In dismissing Plaintiffs' claim for breach of ERISA's duty of loyalty in the original Complaint, the Court found that "there are no factual allegations that Defendants' actions were for the purpose of benefitting themselves or Fidelity . . . as required to show a breach of the fiduciary duty of loyalty."  Order at 21.  The same is true of the Amended Complaint.

---

[11] The May 26, 2016 and August 21, 2016 Committee meeting minutes are cited in the Amended Complaint, Am. Compl. ¶ 38, and therefore are properly considered on a motion to dismiss.  *See GFF Corp.*, 130 F.3d at 1384.

Plaintiffs make no allegations that could support their disloyalty claim, and the Court should dismiss the claim again.

Plaintiffs' claims for failure to monitor fiduciaries, co-fiduciary liability, and knowing breach of trust are derivative of Plaintiffs' primary claims for breach of fiduciary duty.  *See* Am. Compl. ¶¶ 76-84, 85-87.  Because the underlying fiduciary breach claims fail, the derivative claims must be dismissed.  *See* Rec. at 36; Order at 21.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint with prejudice.

DATED:  May 9, 2023

Respectfully submitted,

*/s/ William J. Delany*
William J. Delany
Sean C. Abouchedid
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue, NW
Washington, D.C.  20006
Phone: (202) 857-0620
Fax: (202) 659-4503
Email: wdelany@groom.com
sabouchedid@groom.com

*Counsel for Defendants DISH Network Corporation, Board of Directors of DISH Network Corporation, and DISH 401(k) Plan Committee*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to CMA Civ. Practice Standard 7.1B(b), Defendants' counsel conferred with Plaintiffs' counsel by phone on May 8, 2023, but the parties were unable to agree on an amendment of the Amended Complaint that would narrow or obviate the need for this motion.

<u>*/s/ William J. Delany*</u>
William J. Delany

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2023, a true and correct copy of the foregoing DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT was sent to all counsel of record via the CM/ECF system.

*/s/ William J. Delany*
William J. Delany